# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| CERIA M. TRAVIS ACADEMY, INC., <br><br> Plaintiff, <br><br> v. <br><br> TONY EVERS, <br><br> Defendant. | Case No. 16-CV-593-JPS <br><br><br> ORDER |

      The plaintiff, Ceria M. Travis Academy, Inc. ("Ceria"), brings this action against the defendant, Tony Evers ("Evers"), individually and in his official capacity as Wisconsin Superintendent of Public Instruction, for violation of its Fourteenth Amendment right to due process. (Docket #1). At the initiation of this case, Ceria filed a motion for a preliminary injunction. (Docket #3). Shortly thereafter, on June 10, 2016, Evers filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docket #16). Because certain arguments in the motion for a preliminary injunction were more fully developed in the motion to dismiss briefing, the Court found it prudent to address these matters together. Both motions are now fully briefed and ready for disposition. (Docket #3, #15, #18, #17, #19, #20). As discussed more thoroughly below, the Court will grant Evers's motion to dismiss in its entirety and will, accordingly, deny Ceria's motion for a preliminary injunction as moot.

1. FACTUAL BACKGROUND[1]

Ceria is a domestic non-stock corporation and 501(c)(3) entity duly organized and existing under the laws of the State of Wisconsin. (Compl. ¶ 7). Ceria operates a school, Ceria M. Travis Academy ("Academy"), that provides instruction to students from kindergarten through twelfth grade.[2] (Compl. ¶ 28). Evers is the Wisconsin Superintendent of Public Instruction, which is the executive of the Wisconsin Department of Public Instruction ("DPI"). (Compl. ¶ 8). Evers is responsible for administering and making payments under the Milwaukee Parental Choice Program, pursuant to Wis. Stat. 119.23 ("Choice Program"). (Compl. ¶ 8).

The Choice Program was first enacted by the Wisconsin legislature in 1990. (Compl. ¶ 10). The program allows parents who meet low income and residency requirements to choose to use state funds to enroll their children in a private school participating in the program instead of a Milwaukee public school. (Compl. ¶ 11). As the State Superintendent, Evers is responsible for making state payments to a school participating in the Choice Program on behalf of the students enrolled in the program. (Compl. ¶ 12).

Throughout a school year, schools participating in the Choice Program incur costs associated with providing educational programming instruction and related services to students enrolled in the school. (Compl. ¶ 16).

---

[1] The Court notes that at the motion to dismiss stage, the Court "take[s] as true all well-pleaded facts alleged in the complaint..." *Tamburo v. Dworkin,* 601 F.3d 693, 700 (7th Cir. 2010). As such, all facts, unless otherwise noted, are taken from Ceria's complaint.

[2] Ceria previously operated another school, Travis Technology High School, that is no longer in operation. (Compl. ¶¶ 26-27). Although Ceria's complaint makes multiple references to this second school, it is not a part of the alleged violations in this case and the Court will, therefore, avoid facts relating to Travis Technology to avoid any confusion.

Pursuant to statute, for each school year in which a school participates in the Choice Program, Evers is responsible to pay the school an amount calculated based on the amount of eligible pupils enrolled in the school. (Compl. ¶ 17). This payment is divided into four installments that are to be paid throughout the year, one in September, one in November, one in February, and one in May. (Compl. ¶ 18). DPI has an established payment schedule to determine the amount of the quarterly payment that is subject to adjustments authorized by law at the end of the year. (Compl. ¶ 19).

Each year, a Choice Program School is required to have a financial audit conducted by an independent certified public accountant. The Choice School must submit the audit to DPI on a form called the Financial Information Report. ("FIR") (Compl. ¶ 20). The FIR determines the school's total and per pupil costs for the prior school year. (Compl. ¶ 21). After DPI reviews the FIR, DPI issues a certified letter to determine whether it has overpaid or underpaid the school during the prior year, and adjustments are made between the school and DPI. (Compl. ¶ 22). Additionally, Choice Program schools are required to submit an independent audit of the school's student enrollments that identifies ineligible pupils for whom the school has received payment, the amount of payment received for each such pupil, and additional eligible pupils qualifying the private school for a payment. Those enrollment audits are submitted to DPI. (Compl. ¶ 24). Upon review of the September enrollment audit, DPI certifies an amount due from the school for payments made to the school for ineligible pupils, or amounts due to the school for additional qualifying pupils. (Compl. ¶ 25).

Ceria's school, the Academy, is currently a participant in the Choice Program and has been a participant since 1997. (Compl. ¶ 28). On September 22, 2014, DPI issued preliminary decisions to prohibit the

Academy from future participation in the Choice Program and to withhold the quarterly payments from the 2013-2014 school year. (Compl. ¶ 30). This decision was allegedly made because the Academy's independent auditor failed to timely submit the FIRs for the 2013-2014 year. (Compl. ¶ 30). Ceria appealed the decision and negotiated a settlement to allow the Academy to participate in the Choice Program and receive the November 2014 payment provided that Ceria met certain requirements. (Compl. ¶ 31). On December 17, 2014, pursuant to this agreement, the Academy posted a bond in the amount of $789,222.00; this bond remains in effect to date. (Compl. ¶ 32); (Stipulated Facts ¶ 35, Docket #14 ).

On September 1, 2015, the Academy timely submitted its FIR for the 2014-2015 school year. (Compl. ¶ 47). On November 30, 2015, DPI issued a FIR certification letter for the Academy for the 2014-2015 school year that found the Academy's per pupil cost for eligible programming was $0.00. This finding required the Academy to repay in excess of $2.9 million, which was the total amount previously paid to the Academy for educational programming expenses under the Choice Program during the 2014-2015 school year. (Compl. ¶ 48). In December 2015, Ceria and DPI entered into an agreement allowing the Academy to submit a new FIR for the 2014-2015 school year and its January enrollment audit by February 1, 2016. This agreement was later amended to allow the submissions by March 1, 2016. (Compl. ¶ 51). Additionally, the agreement allowed DPI to withhold from the Academy a future Choice Program payment to be made in May of 2016

for the 2015-2016 school year if DPI overpaid the Academy for the 2014-15 school year as a result of the adjustment process. (Compl. ¶ 51).³

The Academy's May quarterly payment for the Choice Program for the 2016-2016 school year was calculated by DPI to be $617,307.00 based on prior enrollment reports. (Compl. ¶ 53). On March 2, 2016, the new auditors submitted the Academy's January Enrollment Audit to DPI, and on March 4, 2016, they submitted the Academy's new 2014-15 FIR to DPI. (Compl. ¶ 55). In the past, DPI has accepted other FIRs and Enrollment Audits past the submission deadlines. (Compl. ¶ 56).

On March 14, 2016, DPI issued a new FIR certification letter. (Compl. ¶ 57) The certification letter concluded that DPI would withhold the May Payment of $617,307.00 to "net the overpayment" from the past years. (Compl. ¶ 59). DPI issued both the November and March certification letters without conducting an evidentiary hearing. (Compl. ¶ 60). Both certification letters stated that the Academy had a right to appeal to DPI, but if they did not appeal, the certification letters would "constitute the department's final agency decision" and that the Academy was required to exhaust its administrative remedies. (Compl. ¶ 61).

On March 25, 2016, Ceria filed an appeal with DPI and requested a hearing with regard to the March and November certification letters. (Compl. ¶ 62). On March 28, 2016, DPI referred the appeal to the Wisconsin Division of Hearings and Appeals ("DHA") and requested a hearing examiner to

---

³Specifically, the agreement provided that: "If the Department issues the certification letter before the May Choice payment is issued and the Department states in a certification letter that the Department overpaid the School, the Department shall net the overpayment amount from the School's May Choice payment." (Docket #14-1 at 4) (exhibit to parties' stipulated facts). The parties disagree over the significance of this language. (*See* Pl's Opp. at 13, Docket #19).

Page 5 of 19

Case 2:16-cv-00593-JPS   Filed 07/28/16   Page 5 of 19   Document 21

preside over a Class 2 hearing. (Compl. ¶ 63). On April 21, 2016, the parties, through their legal counsel, appeared before DHA Administrative Law Judge Jennifer E. Nashold for a Prehearing Telephone Conference. (Compl. ¶ 65). During this conference, DPI, by its counsel, stated it intended to withhold the May payment from the Academy for the stated reason that DPI would never recover the money.(Compl. ¶ 66).

On April 27, 2016, Ceria filed a motion to stay with ALJ Nashold and requested an order staying DPI's decision to withhold the May payment. (Compl. ¶ 68). On May 10, 2016, the ALJ issued an order denying the motion to stay. (Compl. ¶ 70). On May 23, 2016, the payments to the Choice Program schools were processed into the State's payment system and DPI withheld the May $617,307.00 payment to Ceria. (Stipulated Facts ¶ 33, Docket #14 ). To date, no evidentiary hearing has been held with respect to Ceria's March 25, 2016 appeal. (Stipulated Facts ¶ 34, Docket #14 ) The Academy's 2015-2016 school year ended on June 3, 2016. (Stipulated Facts ¶ 36, Docket #14 ).

2. LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). When reviewing a complaint, the Court construes it in the light most favorable to the plaintiff, accepts as true all well-pleaded facts alleged, and draws all reasonable inferences in the plaintiff's favor. *See Foxxxy Ladyz Adult World, Inc. v. Vill. of Dix, Ill.*, 779 F.3d 706, 711 (7th Cir. 2015).

To survive a motion to dismiss under Rule 12(b)(6), "the complaint must provide enough factual information to 'state a claim to relief that is

plausible on its face' and 'raise a right to relief above the speculative level.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)); *see Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.,* 786 F.3d 510, 526 (7th Cir. 2015) (explaining that a plausible claim need only "'include enough details about the subject-matter of the case to present a story that holds together.'") (quoting *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014)). Thus, a plausible claim is one with "enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations." *Twombly*, 550 U.S. at 556.

To state a plausible claim, a plaintiff is not, however, required to plead specific or detailed facts, *see Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam), nor does the plausibility standard also "impose a probability requirement on plaintiffs: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely.'" *Alam v. Miller Brewing Co.*, 709 F.3d 662, 666 (7th Cir. 2013) (quoting *Twombly*, 550 U.S. at 556); *see Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1099 (7th Cir. 2015) ("In deciding or reviewing a Rule 12(b)(6) motion, [courts] do not ask did these things happen; instead, the proper question to ask is still *could* these things have happened.") (internal quotations omitted). And, there is also no requirement that plaintiffs must state in their complaint "all possible legal theories." *Camasta*, 761 F.3d at 736 (citing *Dixon v. Page*, 291 F.3d 485, 486-87 (7th Cir. 2002)); *see Runnion*, 786 F.3d at 517 (finding a lower court's conclusion that a plaintiff must allege "facts supporting specific legal theories [to be] problematic, to say the least").

3. DISCUSSION

The Court will first address Evers' motion to dismiss because it argues that all claims should be dismissed. As to the claims for injunctive and declaratory relief against Evers in his official capacity, Evers asserts that Eleventh Amendment immunity bars these claims. (Def's Opening Br. at 8, Docket #17). As to the claim against Evers in his individual capacity, Evers argues he is entitled to qualified immunity because the law was not clearly established at the time of the alleged violation. (Def's Opening Br. at 12, Docket #17). Ceria argues that neither immunity defense applies and that both the official and individual capacity claims against Evers should proceed. (Pl's Opp. at 2, 8, Docket #19). As discussed below, the Court will grant Evers' motion to dismiss in its entirety.

3.1  Eleventh Amendment Immunity

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although not explicitly in the text, courts have found that "the Eleventh Amendment guarantees that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *See, e.g., Bd. of Regents of Univ. of Wis. Sys. v. Phx. Int'l Software, Inc.*, 653 F.3d 448, 457 (7th Cir. 2011) (internal quotation marks citation omitted). "If properly raised, the amendment bars actions in federal court against a state, state agencies, or state officials acting in their official capacities." *Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 370 (7th Cir. 2010); *see also Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("[A]bsent waiver by the State or valid congressional override, the

Eleventh Amendment bars a damages action against a State in federal court….This bar remains in effect when State officials are sued for damages in their official capacity."); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment"). The Eleventh Amendment was intended "to prevent the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (citation omitted). Thus, it provides not merely a defense to liability, but immunity from suit. *Id.* at 145–46.

However, even when properly raised, sovereign immunity does not equate to absolute immunity. Here, Ceria argues that Eleventh Amendment immunity is not applicable under the *Ex parte Young* doctrine first articulated by the Supreme Court in *Ex parte Young,* 209 U.S. 123 (1908). The *Ex parte Young* doctrine "allows private parties to sue individual state officials for prospective relief to enjoin ongoing violations of federal law." *Council 31 of the AFSCME v. Quinn,* 680 F.3d 875, 882 (7th Cir. 2012) (citations omitted). The longstanding rationale behind this doctrine is that, "because an unconstitutional legislative enactment is 'void,' a state official who enforces that law 'comes into conflict with the superior authority of the Constitution,' and therefore is 'stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.'" Va. Office for Prot. & Advocacy v. Stewart, ––– U.S. ––––, 131 S. Ct. 1632, 1638 (2011) (quoting *Ex parte Young,* 209 U.S. at 159–60).

To determine whether *Ex parte Young* applies, the Court "need only conduct a straightforward inquiry into whether the complaint alleges an

ongoing violation of federal law and seeks relief properly characterized as prospective." *Council 31,* 680 F.3d at 882 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). However, "[a]s in most areas of the law, the difference between the type of relief barred by the Eleventh Amendment and that permitted under *Ex parte Young* will not in many instances be that between day and night." *Edelman v. Jordan,* 415 U.S. 651, 667 (1974). As discussed below, the Court finds that Ceria's claims fail under both prongs of the *Ex parte Young* inquiry, and thus the exception does not apply.

### 3.1.1 Ongoing Violation of Federal Law

Here, there is no question that Ceria alleges a violation of federal law—namely, that Evers has violated its Fourteenth Amendment right to due process. (*See* Compl. at 13). Evers argues at length in his reply brief that his actions did not constitute a taking of property or a violation of due process. (Reply at 1-2. Docket #20). But, the inquiry into whether *Ex parte Young* applies does not include an analysis of the merits of the claim. *Verizon Md.,* 535 U.S. at 646; *see also Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 281 (1997) ("An *allegation* of an ongoing violation of federal law…is ordinarily sufficient" (emphasis added)). The more complicated question, however, is whether the alleged violation of federal law in this instance is "ongoing."

Ceria argues that the violation is ongoing because Evers "continues to violate the Fourteenth Amendment as long as he continues to hold Ceria's property without the benefit of a hearing to determine whether Defendant is entitled to that property." (Pl's Opp. at 3, Docket #19). In contrast, Evers argues that the alleged violation cannot be construed as ongoing because the requested relief is a "one-time payment from [the] State's treasury." (Def's Reply at 3, Docket #20).

In *Sonnleitner v. York*, 304 F.3d 704 (7th Cir. 2002), the Seventh Circuit found that the "underlying procedural due process claim" could not be "reasonably construed as 'ongoing.'" *Id.* at 718. The court noted that, even assuming the plaintiff's constitutional rights were violated, the violation was not the demotion of the employee, but rather the fact that the demotion occurred without an adequate opportunity to be heard. *Id.* The court found this was a past violation, not an ongoing one, and that the *Ex parte Young* exception did not apply to overcome Eleventh Amendment immunity. *Id.*; *see also Garcia v. Illinois State Police*, 2006 WL 2191341, *3 (C.D. Ill. 2006) (denial of pre-termination hearing cannot give rise to an ongoing procedural due process claim under *Ex parte Young*).

Similarly to *Sonnleitner,* the Court finds that the due process violation alleged here—withholding the May payment without an adequate opportunity to be heard—is not an ongoing violation. Evers' alleged withholding of the May payment without a hearing was a one-time event that occurred in the past. Ceria makes no allegations with respect to any future payments, and as such the allegations here cannot properly be described as ongoing. Accordingly, the Court finds that Ceria fails the first part of the test, and that *Ex parte Young* does not apply to avoid Eleventh Amendment immunity. Although this conclusion technically ends the discussion because an ongoing violation is necessary to meet the *Ex parte Young* exception, the Court will, nonetheless, continue to the second prong of the test for a more complete analysis.

### 3.1.2 Permissible Prospective Relief

The second prong of the *Ex parte Young* doctrine asks whether the relief sought is prospective in nature. Ceria seeks: (1) a temporary and permanent injunction restraining the alleged constitutional violations and

"direction to Defendant to take such affirmative action as is necessary to release to Plaintiff the May Payment prior to the conclusion of an evidentiary hearing"; and (2) declaratory relief against Evers regarding the unlawful and unconstitutional acts and practices. (Compl. at 15-16).

"'*Ex parte Young* cannot be used to obtain an injunction requiring the payment of funds from the State's treasury…or an order for specific performance of a State's contract.'" *Council 31,* 680 F.3d at 882 (quoting *Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 265-57 (2011)). Courts have recognized, however, that prospective relief of an ongoing federal violation will often require state officials to dip into the state's treasury to comply with a court's order. *Id.* (citing *Edelman,* 415 U.S. at 668). "[W]here a plaintiff's request is for relief 'would have an effect upon the state treasury that is not merely ancillary but is the essence of the relief sought,' it is barred by the Eleventh Amendment." *Id.* at 882-83. Thus, the Court must look not just at the type of relief sought, but, more specifically, to "the effect the relief would have on the State if it were afforded to the plaintiff." *Id.* at 883.

Two Seventh Circuit cases exemplify these principals. In *McDonough Assocs., Inc. v. Grunloh,* 722 F.3d 1043 (7th Cir. 2013), the Seventh Circuit considered—and rejected—an *Ex parte Young* argument similar to the one Ceria raises here. There, the court found that the plaintiff's claim was "an attempt by a state contractor...to pursue what amount[ed] to a breach of contract claim against the State of Illinois in federal court." *Id.* at 1045. When "[t]hreatened with bankruptcy and collapse if it did not receive payments it contends were due from the state, [the plaintiff] presented the district court with a creative theory for relief under the Due Process Clause of the Fourteenth Amendment." *Id.* The Seventh Circuit found that, although the plaintiff had "cloaked its claim in the language of federal due process, its suit

remain[ed] in substance an effort to have a federal court order state officials to make payments from the state treasury to remedy past alleged breaches of contract." *Id.* As such, the court found that the plaintiff's claims were barred by the Eleventh Amendment. *Id.*

Similarly, in *Council 31,* union plaintiffs representing state employees brought suit against state officials to challenge the state's pay freeze. 680 F.3d at 878-80. The plaintiffs argues that their request for injunctive relief fell into the *Ex parte Young* exception, but the Seventh Circuit disagreed because the "essence of the relief sought" was the payment of funds out of the State treasury to the plaintiffs. *Id.* at 884. Notably, the court found it immaterial that granting the injunction would not explicitly direct payment from the State's treasury because the effect was still the same. *Id.*

Here, similar reasoning applies and the Court finds that the *Ex parte Young* exception does not apply because the "essence" of Ceria's requested relief is money from the State of Wisconsin. Although Ceria attempts to cloak its dispute as one involving due process, it is clear that what it really wants is the $617,307.00 May payment from the State of Wisconsin. (*See* Compl. at 15-16) (requesting Court to order Evers to take "action as is necessary to release to Plaintiff the [$617,307.00] prior to the conclusion of an evidentiary hearing"); *see also Goros v. Cnty. of Cook,* 489 F.3d 857 860 (7th Cir. 2007) (finding that, despite allegations of due process claim, it was clear from their complaint that "Plaintiffs don't want *process*; they want money"). Ceria's request for the Court to order Evers to make the $617,307.00 payment simply cannot be described as merely an ancillary effect on the State's treasury. *See MSA Realty Corp. v. Illinois,* 990 F.2d 288. 293 (7thCir. 1993) (where relief "would have an effect upon the state treasury that is not merely ancillary but is the essence of the relief sought," it is barred by the Eleventh Amendment).

Ceria's reliance on *Bowen v. Massachusetts,* 487 U.S. 879, (1988), is unpersuasive for several reasons. Notably, *Bowen* did not involve any analysis of the *Ex parte Young* doctrine and its application, which is the precise issue before the Court today. While the Court certainly recognizes that *Bowen's* discussion of the distinction between monetary damages and injunctive relief is relevant to the issue, it is not outcome determinative. Since 1985, when *Bowen* was decided, courts have substantially developed the *Ex parte Young* doctrine to provide courts guidance as to its specific application. The Court recognizes and agrees with Ceria that its claim is not specifically for money damages, however, the injunctive relief requested would nonetheless have the *effect* of a monetary award against the State of Wisconsin as the Seventh Circuit found in *Council 31. See* 680 F.3d at 883. This effect is impermissible under the Eleventh Amendment. Whatever the appeal of an argument that the State owes Ceria its May payment prior to a hearing, the Eleventh Amendment was a "swift and direct rejection" of the notion that federal courts have the power to compel states to comply with their financial obligation to private parties. *McDonough,* 722 F.3d at 1053. For this reason, the Court finds that Ceria's request for injunctive relief does not fit within the *Ex parte Young* exception and is, therefore, barred by the Eleventh Amendment.

Finally, although neither party addressed the issue of the declaratory relief sought, the Court must briefly address it. The Seventh Circuit has expressly found that "declaratory relief should not be awarded where the eleventh amendment bars an award of monetary or injunctive relief otherwise the [declaratory] relief would operate as a means of avoiding the amendment's bar." *MSA Realty Corp. v. State,* 990 F.2d 288, 295 (7th Cir. 1993); *accord Council 31* 680 F.3d at 884. As such, the Court finds that the Eleventh

Page 14 of 19

Case 2:16-cv-00593-JPS   Filed 07/28/16   Page 14 of 19   Document 21

Amendment bars both the declaratory and injunctive relief that Ceria seeks against Evers in his official capacity, and the Court will grant Evers' motion to dismiss the official capacity claims.

### 3.2 Qualified Immunity

In addition to the claim against Evers in his official capacity, Ceria also requests compensatory and punitive damages against Evers in his individual capacity.[4] (Compl. at 15-16). Evers argues that, regardless of any constitutional violation, he is nonetheless entitled to qualified immunity because the law was not clearly established at the time of the violation. (Def's Opening Br. at 13-16). The Court agrees.

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Likewise, "[i]t gives public officials breathing room to make reasonable but mistaken judgments about open legal questions." *Id.* (internal citations

---

[4] Additionally, the parties briefly touch on the subject of Evers' personal involvement in the alleged constitutional violation. (Def's Opening Br. at 14 n.2, Docket #17); (Pl's Opp. at 7, Docket #19). Evers initially suggests this argument in only a footnote, and the argument is not properly developed. As such, the Court will not address this line of argument because, regardless of his personal involvement, the Court finds that Evers is entitled to qualified immunity on the claims against him in his individual capacity.

omitted) (internal quotation marks omitted). When properly applied, the doctrine protects. Whether a defendant is entitled to qualified immunity is a question of law. *Llaguno v. Mingey*, 763 F.2d 1560, 1569 (7th Cir. 1985), *cert. dismissed*, 478 U.S. 1044 (1986).

Determining the applicability of qualified immunity involves a two-part analysis. *Saucier v. Katz*, 533 U.S. 194, 199 (2001). First, the court must decide whether, "[t]aken in the light most favorable to the party asserting the injury, the facts alleged show the officer's conduct violated a constitutional right." *Id.* at 201. Second, "the court must determine whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. The Court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

In this case, the Court will exercise its discretion to analyze the second prong of the qualified immunity analysis first. To determine whether a right is clearly established, the Court must look to precedent "to determine whether there was such a clear trend in the case law that [the Court] can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time." *Abbott*, 705 F.3d at 731 (internal citations omitted). "The inquiry into whether a right is clearly established 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Borello v. Allison*, 446 F.3d 742, 750 (7th Cir. 2006) (citing *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). Though "it is not necessary for the particular violation in question to have been previously held unlawful," *Bd. v. Farnham*, 394 F.3d 469, 477 (7th Cir. 2005), "[a] plaintiff is required to show that a violation of that right has been found in factually

similar cases, or that the violation was so clear that an official would realize he or she was violating an inmate's constitutional rights even in the absence of an on-point case." *Borello*, 446 F.3d at 750. A state official "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent…placed the statutory or constitutional question beyond debate." *Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015) (citing *City & Cty. of San Francisco, Cal. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015)). Recently, in *Mullenix v. Luna*, 136 S. Ct. 305 (2015), the Supreme Court reiterated the notion that courts must not define clearly established law at a high level of generality. *Id.* at 308.

At this juncture in the case, the Court takes no position on whether Ceria's allegations against Evers constituted a due process violation; Evers does not make this argument. However, under the second prong of the qualified immunity analysis, the Court finds that Ceria has failed to establish that this right was clearly established at the time of the alleged violation. Although Ceria need not offer up a federal decision which precisely mirrors the facts of this case, at a minimum it must point to a closely analogous case decided prior to the challenged conduct. *See Lawshe v. Simpson*, 16 F.3d 1475, 1483 (7th Cir. 1994). Ceria contends that the Supreme Court's decisions in *Fuentes v. Shevin,* 407 U.S. 67 (1972), *Zinermon v. Burch,* 494 U.S. 113 (1990), and *Parratt v. Taylor,* 451 U.S. 527 (1981) clearly established its right to a pre-deprivation hearing in this instance. The Court disagrees.

True, the cases Ceria relies upon clearly establish the general principle that due process will often require a hearing prior to the taking of property. However, the Supreme Court has repeatedly instructed courts not to define

clearly established law at a high level of generality. *See, e.g.*, *Mullenix*, 136 S. Ct. at 308. In order to overcome qualified immunity, a plaintiff must show that a violation of that right has been found in *factually* similar cases. *Borello*, 446 F.3d at 750. Tellingly, Ceria does not discuss *any* factual similarities of the cases upon which it relies with the facts presented here. Indeed, had the Court not conducted its own independent research, it would know little to nothing about the facts of these cases. Ceria's relied upon cases have no factual similarity to the present case. For example, *Fuentes* involved the constitutionality of Florida and Pennsylvania laws authorizing the summary seizure of goods or chattels in a person's possession under a writ of replevin, 407 U.S. at 469, and *Zinermon* involved a patient who alleged that a Florida hospital deprived him of due process by admitting him as a "voluntary" mental patient when he was incompetent to give informed consent to his admission. 494 U.S. at 115.

Ceria bears the burden of establishing the existence of a clearly established constitutional right, *see Rakovich v. Wade*, 850 F.2d 1180, 1209 (7th Cir.1988) (*en banc*); *accord Delgado*, 282 F.3d at 516; *Forman v. Richmond Police Dep't*, 104 F.3d 950, 957–58 (7th Cir.1997), and it has failed to show any factual similarities between this case and existing law at the time of the alleged violation. Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341, and Ceria has failed to show that Evers' conduct fits within this category. In light of the foregoing, the Court concludes that Ceria has failed to meet its burden to show that the law was clearly established at the time of the alleged violation. Thus, Evers is entitled to qualified immunity for the claims against him in his individual capacity, and the Court will grant the motion to dismiss on this ground.

4. CONCLUSION

As discussed above, the Court finds that: (1) *Ex parte Young* does not apply and the claims against Evers in his official capacity are barred by Eleventh Amendment immunity; and (2) Evers is entitled to qualified immunity on the claims against him in his individual capacity. In light of the foregoing, the Court will grant Evers' motion to dismiss in its entirety, and this action will be dismissed.

Accordingly,

IT IS ORDERED that the defendant's motion to dismiss (Docket #16) be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED; and

IT IS FURTHER ORDERED that the plaintiff's motion for a preliminary injunction (Docket #3) be and the same is hereby DENIED as moot.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 28th day of July, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge